IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Jestine Perry Evans, | ) | Civil Action No. 8:14-cv-04019-TLW-JDA |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF THE MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and Title 28, U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB").  For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed and remanded for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

In February 2009, Plaintiff protectively filed an application for DIB, alleging an onset of disability date of May 1, 2006.  [R. 99–101.]  The claim was denied initially and on reconsideration by the Social Security Administration ("the Administration").  [R. 47–52].  On April 1, 2009, Plaintiff requested a hearing before an administrative law judge ("ALJ"),

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

and, on May 10, 2010, ALJ Edward T. Morriss conducted a de novo hearing on Plaintiff's claims. [R. 26–46].

On May 28, 2010, the ALJ issued a decision finding Plaintiff not disabled within the meaning of the Social Security Act ("the Act") from May 24, 2006,[2] through the date of the decision. [R. 13–25.] Plaintiff requested Appeals Council review of the ALJ's decision, but the Council declined review. [R. 1–3]. Plaintiff filed an action for judicial review on December 30, 2011, and on February 22, 2013, this Court[3] reversed and remanded the decision to the Commissioner to address, among other things, specific restrictions regarding the Plaintiff's ability to engage in repetitive use of her right upper extremity. [*See Evans v. Astrue*, C/A No. 8:11-cv-3551-JDA, R. 460–86.]

On April 9, 2013, the Appeals Council vacated the previous decision and remanded the case to the same ALJ for further administrative proceedings consistent with the district court's Order. [R. 489.] Additionally, the Appeals Council directed the ALJ to associate the previously considered claim file with a subsequent claim for DIB filed by Plaintiff on June 8, 2011, and to issue a new decision on the consolidated claims. [R. 489.]

ALJ Edward T. Morriss held a subsequent hearing on Plaintiff's claims on June 16, 2014. [R. 407–21.] The ALJ issued a decision on August 15, 2014, finding Plaintiff was not under a disability within the meaning of the act from the alleged onset date of May 1, 2006, through the date last insured ("DLI"), December 31, 2012. [R. 369–80.]

---

[2]Plaintiff amended the onset date of disability from May 1, 2006 to May 24, 2006. [R. 16.]

[3]Because the parties had consented to disposition by a magistrate judge, the undersigned entered an Order instead of a Report and Recommendation.

2

At Step 1,[4] the ALJ found Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2012, and had not engaged in substantial gainful activity during the period from her alleged onset date of May 1, 2006, through her DLI of December 31, 2012. [R. 371, Findings 1 & 2.]  At Step 2, the ALJ found Plaintiff had the following severe impairments: right rotator cuff tear status post-surgery, fibromyalgia, and cervical spondylosis/degenerative disc disease.  [R. 371, Finding 3.]

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. 372, Finding 4.]  Before addressing Step 4, Plaintiff's ability to perform his past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), which is defined as the ability to lift/carry 10 pounds frequently and 20 pounds occasionally, stand and/or walk six hours during an eight-hour workday, and sit for six hours in an eight-hour workday. However, the claimant can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but cannot perform work that would require more than occasional climbing of ladders, ropes, or scaffolds. Further, the claimant cannot perform more than occasional overhead reaching with the right upper extremity, or more than frequent handling with the right upper extremity.

[R. 372.]

At Step 4, the ALJ noted Plaintiff was unable to perform any of her past relevant work.  [R. 378, Finding 6.]   Considering Plaintiff's age, education, work experience, and

---

[4]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

RFC through the DLI, the ALJ relied on the Medical-Vocational Guidelines to determine that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. [R. 379, Finding 10.] On this basis, the ALJ found Plaintiff had not been under a disability as defined by the Act at any time from May 1, 2006, the alleged onset date, through December 31, 2012, the DLI. [R. 379, Finding 11.]

Plaintiff requested Appeals Council review of the ALJ's decision but the Council declined. [R. 1–3. ] Plaintiff filed this action for judicial review on October 15, 2014. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff argues the ALJ's decision is not supported by substantial evidence and should be remanded for further consideration because the ALJ failed to cure the defects in his original decision by failing to explain how Plaintiff is able to use her right arm and hand for six out of eight hours in a work day. [Doc. 17 at 20.] Additionally, Plaintiff contends the ALJ failed to address Dr. Forrest's opinions, only addressed the weight restrictions in Dr. McKoy's opinion, dismissed Nurse Practitioner Stauffer's opinion out of hand, and failed to explain how the contradictory opinions of the state agency doctors were consistent with the record evidence. [*Id*. at 20–21.] Plaintiff also challenges the ALJ's credibility analysis as non-compliant with the regulations and laws of this Circuit [*id*. at 21–24]; and challenges the ALJ's Step 5 analysis for failure to consult a vocational expert in the presence of exertional and non-exertional limitations [*id*. at 24–26].

The Commissioner, on the other hand, contends the ALJ's decision is supported by substantial evidence and that the ALJ properly found Plaintiff, notwithstanding her right

4

rotator cuff tear status post-surgery and cervical spondylosis/degenerative disc disease, retained the RFC to perform less than the full range of light work. [Doc. 18 at 1.] The Commissioner contends the ALJ properly assessed Plaintiff's RFC by engaging in a function-by-function analysis and thoroughly assessed and discussed the extent to which Plaintiff could manipulate with her right arm, how much she could lift or carry, and further assessed additional postural limitations. [*Id*. at 22–26.] The Commissioner also contends the ALJ properly assessed Plaintiff's credibility in accordance with the regulations, sufficiently articulated why he found Plaintiff's statements to be only partially credible, and identified with specificity the substantial evidence in the record that supported the credibility finding. [*Id*. at 26–30.] Lastly, the Commissioner contends that the ALJ properly relied on the Grids, given the RFC supported by substantial evidence, limiting Plaintiff to no more than occasional overhead reaching with the right upper extremity, or more than frequent handling with the right upper extremity, to account for her pain. [*Id*. at 31–32.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963))("Substantial evidence, it has been held, is evidence which a reasoning

5

mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the

courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v.*

*Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of*

*Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[5]  With remand under sentence

six, the parties must return to the court after remand to file modified findings of fact.

*Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and

does not enter a final judgment until after the completion of remand proceedings.  *See*

*Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an

order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C.

§ 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period
> of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

---

[5]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. § 404.1520. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

## A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 404.1572(a)—and gainful—done for pay or profit,

10

whether or not a profit is realized, *id.* § 404.1572(b).  If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity.  *Id.* §§ 404.1574–.1575.

###    B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* § 404.1521.  When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses.  *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B).

###    C.    *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 404.1509, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.  20 C.F.R. § 404.1520(d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[6] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. § 404.1560(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); 20 C.F.R. § 404.1520(f)–(g).  To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers

---

[6]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a).

primarily from an exertional impairment, without significant nonexertional factors.[7]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *see also Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. § 404.1569a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

---

[7]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs.  20 C.F.R. § 404.1569a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  § 404.1569a(c)(1).

13

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the

14

opinion, 20 C.F.R. § 404.1527(c). Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 404.1527(c)(2). An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. § 404.1527(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV. Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 404.1517; *see also Conley v.*

*Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 404.1517. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re

16

not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
> 
> ...
> 
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered.  Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity,

> severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. § 404.1529(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria. *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor. But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

18

## APPLICATION AND ANALYSIS

**Medical History**

On May 24, 2006, Plaintiff was pulling an object on the assembly line at work when she experienced pain in the neck, shoulder, and arm.  [R. 163.]  Dr. Byron Williams ("Dr. Williams") saw Plaintiff on May 31, 2006, and diagnosed her with muscle strains to the right arm.  [R. 288.]  Plaintiff continued to see Dr. Williams and participated in physical therapy during June 2006.  [R. 289–95.]  Images from July 6, 2006, showed mild-appearing degenerative disc disease at C5/6.  [Doc. 274.]

On July 26, 2006, Plaintiff saw Dr. John Ernst ("Dr. Ernst"), who treated Plaintiff with an injection and found her symptoms were suggestive of bursitis and possible serosal rotator cuff disease.  [R. 164.]  Dr. Ernst recommended a right shoulder MRI scan.  [R. 165]  The MRI on August 10, 2006, showed a tiny partial thickness undersurface infraspinatus tendon tear.  [R. 177.]  Dr. Ernst reviewed these results with Plaintiff, noting the MRI was consistent with an inferior surface small rotator cuff tear, and recommended arthroscopic evaluation with possible debridement and possible anterior acromioplasty.  [R. 166.]  In September 2006, Dr. Ernst saw Plaintiff for a follow-up appointment and assessed residual right shoulder subacromial impingement and bursitis with partial thickness infraspinatus tear.  [R. 168.]

On October 3, 2006, Plaintiff underwent a right shoulder arthroscopic evaluation with limited intraarticular and intermediate suacromial debridement.  [R. 181.]  She saw Dr. Ernst for a follow-up on October 17, 2006, where he found Plaintiff was doing well with a full range of motion, and indicated she was limited to five pounds use at that time and

19

could advance progressively over the next month.  [R. 170.]  One week later, Dr. Ernst recommended Plaintiff remain on light duty.  [R. 172.]

In November 2006, Dr. Ernst treated Plaintiff with an injection and indicated she would advance progressively to full use of her shoulder by December 2006.  [R. 173–74.] On December 13, 2006, Dr. Ernst noted Plaintiff had returned to work and indicated she had essentially reached maximum medical benefits with respect to her shoulder.  [R. 175.] Dr. Ernst assigned Plaintiff a 3% permanent partial impairment to her right upper extremity for residual shoulder girdle symptomatology.  [*Id.*]  Dr. Ernst also recommended a C-spine consultation and noted this had not been approved by workers' compensation; therefore, Plaintiff would have to pursue that on her own.  [*Id.*]

In May 2007, Dr. Ernst saw Plaintiff again with complaints of persistent pain in her neck, posterior scapula, and right shoulder axilla.  [R. 176.]  Dr. Ernst noted that Plaintiff's permanent partial impairment remained unchanged from her previous rating and again recommended a C-spine consult.  [*Id.*]  Also in May 2007, Plaintiff saw Dr. Leonard Forrest, who recommended a cervical MRI.  [R. 214–15.]  Plaintiff underwent a cervical MRI on June 18, 2007, which revealed diffuse mild spondylosis and a C5/6 type I Modic change that could cause nonradicular pain.  [R. 179–80.]

In July 2007, Plaintiff returned to Dr. Forrest complaining that her activities at work involved a lot of repetitive work for the right arm and she was having more and more symptoms.  [R. 210.]  Dr. Forrest recommended a cervical epidural injection.  [*Id.*]  Dr. Forrest treated Plaintiff with cervical injections on August 9 and 28, 2007.  [R. 212–13.] After seeing Plaintiff twice more, Dr. Forrest noted that seven sessions of physical therapy had not helped Plaintiff and ordered an EMG and nerve conduction study.  [R. 207.]  The

20

EMG and nerve conduction study failed to show evidence of radiculopathy and overall was a normal study.  [R. 206.]

On November 28, 2007, Dr. Forrest noted electrical stimulation was at least temporarily beneficial and ordered another injection. [R. 205.] Dr. Forrest also opined that Plaintiff could not perform work involving repetitive activities with the upper extremities. [*Id.*]  Dr. Forrest treated Plaintiff with an injection on December 4, 2007, [R. 204] and later noted she obtained no relief from that injection [R. 203].

In January 2008, Dr. Forrest ordered a new cervical MRI and determined that there was no structural worsening or new problem causing Plaintiff's recent worsening of symptoms and lack of response to the cervical injection.  [R. 202.]  Dr. Forrest again noted Plaintiff was unable to return to her previous type assembly work where repetitive upper extremity activity is required.  [*Id.*]  Plaintiff was treated with an injection on January 22, 2008.  [R. 201.]

Plaintiff saw Dr. Forrest again in February and March 2008.  [R. 197–200.]  On March 12, 2008, Dr. Forrest opined that Plaintiff was at maximum medical improvement because doing further therapy or injections was not going to make a meaningful difference in terms of Plaintiff's outcome.  [R. 197.]  He further opined that Plaintiff would intermittently have symptoms that are more prominent and that injections or therapy may still be needed in the future.  [*Id.*]  Dr. Forrest defined a fifteen percent permanent impairment rating to the whole person and noted his impairment rating is entirely separate from whatever rating might be assigned to her shoulder.  [*Id.*]  With respect to Plaintiff's ability to return to her prior industrial work, Dr. Forrest opined Plaintiff was unable to return to that type work,

noting that Plaintiff is right-hand dominant and the use of her right upper extremity would be very limited.  [R. 197–98.]

Plaintiff saw Dr. Forrest a number of times from March through October 2008.  [R. 186–96.]  Plaintiff received three more injections during that time period.  [R. 187, 190, 195.]  On October 1, 2008, Dr. Forrest again opined that Plaintiff would be limited with regard to any repetitive use of the right upper extremity and noted Plaintiff is right handed. [R. 186.]

With respect to Plaintiff's exertional limitations, Dr. Jim Liao, a medical consultant, opined by Physical RFC assessment dated February 13, 2009, that Plaintiff could:

a.    occasionally lift and/or carry 20 pounds;
b.    frequently lift and/or carry 10 pounds;
c.    stand and/or walk about 6 hours in an 8-hour day;
d.    sit, with normal breaks, about 6 hours in an 8-hour work day; and
e.    push and/or pull in an unlimited fashion except as shown for lift and carry.

[R. 300.]  With respect to Plaintiff's postural limitations, Dr. Liao opined Plaintiff could frequently climb ramp/stairs, balance, stoop, kneel, crouch, and crawl but only occasionally climb ladder/rope/scaffolds.  [R. 301.]  With respect to Plaintiff's manipulative limitations, Dr. Liao opined Plaintiff was limited in reaching and handling but unlimited in fingering and feeling. [R. 302.] Dr. Liao stated that Dr. Forrest's opinion that Plaintiff could not get back into the work force was not fully supported by the objective evidence in the file but that Dr. Forrest's opinion that Plaintiff would be limited with regard to any repetitive use of her right upper extremity ("RUE") was consistent with objective findings.  [R. 305.] Dr. Liao indicated his opinion was supported by medical records ranging from July 2006 through October 2008 and also referenced an MRI from 1999.  [R. 300–01.]

A September 2009 radiology report showed degenerative disc disease at several levels, most pronounced at C5-C6. [R. 325.] An October 2009 MRI revealed mild degenerative changes in the upper cervical spine without stenosis; minimal central disc protrusion at C4-C5; mild disc degeneration at C5-C6 with mild central canal stenosis; and minimal disc degeneration at C6-C7 with developing small to moderate-sized central disc protrusion producing mild flattening of the ventral spinal cord and mild central canal stenosis. [R. 323, 719.] Notes from Palmetto Primary Care Physicians also indicate the results of an MRI of the right shoulder in October 2009 showing moderate grade partial thickness undersurface tear involving the supraspinatus tendon with a component of delamination; no evidence of a full thickness rotator cuff tear; and minimal involvement of the infraspinatus tendon. No atrophy of the rotator cuff muscles. [R. 316, 718.]

In November 2009, Plaintiff saw Dr. Brodie McKoy ("Dr. McKoy") for her right shoulder pain. [R. 345–47, 734.] Plaintiff complained that the pain radiated to her right arm and described the pain as "burning." [R. 734.] Plaintiff relayed that the pain was relieved by heat, ice, pain/RX meds and rest, and was aggravated by movement. [*Id*.] Associated symptoms included decreased mobility, night pain, night-time awakening, swelling, tingling in the arms, tenderness and weakness. [*Id*.] Dr. McKoy assessed Plaintiff with a partial high grade rotator cuff tear, treated Plaintiff with an injection, and opined that, pending her response to the injection, Plaintiff may need a scope, debridement, and repair of the partial cuff tear. [R. 346, 733.]

On November 11, 2009, Plaintiff was seen by  Dr. Joseph M. Marzluff ("Dr. Marzluff") for evaluation of neck pain and right shoulder pain. [R. 712.] Physical examination revealed marked restriction in range of motion of the neck in all directions and

23

marked pain upon movement of the shoulders, but no motor or sensory deficits.  [*Id*.]  Dr. Marzluff determined that Plaintiff had two problems: she had some cervical spinal degenerative disc disease confirmed with MRI and plain films, and she had rotator cuff problems which were unrelated.  [R. 712.]

On December 8, 2009, Dr. McKoy performed a right shoulder scope and arthroscopic PASTA cuff repair.  [*See* R. 348, 735.]  In January 2010, Plaintiff returned to Dr. McKoy complaining that her post-operative status was worsening.  [R. 349, 736.] Plaintiff explained that the pain was "aching" and that it was aggravated by movement, but relieved by rest and stretching.  [R. 736.]  In March 2010, Plaintiff complained to Dr. McKoy that her pain had worsened and was relieved by rest.  [R. 350–51, 737.]  Dr. McKoy assessed a rotator cuff sprain and treated Plaintiff with an injection.  [R. 351, 738.]

In April 2010, Plaintiff returned to Dr. McKoy with right ankle pain which was constant and worsening.  [R. 740.]  Plaintiff indicated the pain was aggravated by movement, walking and activity, but was relieved by brace/splint, pain/RX meds and rest. [*Id*.]  Upon examination, Dr. McKoy determined Plaintiff's ankle was fractured.  [R. 741.]

Dr. McKoy completed a medical source statement dated April 29, 2010, indicating the following:

- in an 8-hour work day, Plaintiff could sit 2 hours, stand 1 hour, and walk 0 hours due to disc degeneration / arthritis back, ankle arthritis / fracture;

- Plaintiff could lift up to 10 pounds occasionally and never lift over 10 pounds due to chronic cuff tear s/p repair stiffness shoulder;

- Plaintiff could never carry due to chronic cuff tear s/p repair stiffness shoulder;

- Plaintiff could sit 30 minutes before changing position and stand 30 minutes before changing position to relieve pain;

- Plaintiff could use both her hands for repetitive action such as simple grasping and fine manipulation but could not use right or left hand for repetitive action such as pushing or pulling due to shoulder [] arthritis stiffness;

- Plaintiff would have to miss work four or more times a month due to her impairments;

- Plaintiff was unable to bend, squat, crawl, climb, reach above, stoop, crouch, or kneel due to shoulder cuff tear, back symptoms; and

- Plaintiff's prescription medication caused drowsiness and impaired concentration.

[R. 362–65.]

On June 10, 2010, Dr. McKoy wrote a letter to "To whom it may concern" opining that his letter was in response to the "Judge's ruling" on Plaintiff's disability and work status, explaining that Plaintiff has permanent restriction of 10/lbs of lifting with her right upper extremity due to her rotator cuff repair and 4/5 strength in the rotator cuff. [R. 900.]

On June 28, 2010, Plaintiff returned to Dr. McKoy complaining of worsening shoulder pain which was described as aching and sharp. [R. 745.] Plaintiff indicated the pain was aggravated by lifting, movement and night, was relieved by RX pain meds and rest. [*Id*.] Dr. McKoy assessed a complete rupture of the rotatorcuff and treated Plaintiff with an injection. [R. 746.] Plaintiff saw Dr. McKoy again on July 22, 2010, with right shoulder pain complaints, and Dr. McKoy ordered an MRI. [R. 748.] The MRI findings showed:

1. Low grade intrasubstance and articular-sided partial tear of the supraspinatus and infraspinatus tendons.

2. Postoperative change is noted. Grade I AC separation.

25

3.   Mild irregularity of the superior labrum suggests degenerative change, prior resurfacing or nondisplaced tear.

[R. 758.]   Notes from the MRI also indicate the presence of mild atrophy of the supraspinatus and infraspinanus along the central tendon estimated at less than 10%, with no significant atrophy of the subscapularis or teres minor muscles. [*Id*.]

During Plaintiff's follow up with Dr. McKoy on August 30, 2010, after reviewing the MRI, Plaintiff elected to proceed with surgery. [R. 751.]   After the operation, on September 20, 2010, Plaintiff reported improving pain; she, however, was not in rehab and was not performing home exercises.   [R. 752.]

Plaintiff presented to Dr. Shaughnessy V. Mullen ("Dr. Mullen") on November 16, 2010, on follow up to an CESI injection she had in January 2009.   [R. 720.]   Plaintiff explained that the injection did not help and that, since then, she's had surgery on her right shoulder which had not helped either. [*Id*.]   The surgery, however, was less than two months prior to her visit and she was still healing.   [*Id*.]   Plaintiff, however, was bothered most by new pain located in her lower back.   [*Id*.]   On physical examination, volitional pain was present when examining the right shoulder; on neurological exam, Plaintiff had 5/5 motor strength bilaterally throughout, normal gait, intact sensation to light touch and pressure; Plaintiff's back was normal with minimal diffuse myofascial tenderness poorly focalizes; extremities had no clubbing, edema or rash; limited ROM in the right shoulder; and negative straight leg raises bilaterally. [*Id*.]   Treatment notes dated December 6, 2010, indicated Plaintiff was performing her home exercises but was not in rehab. [R. 754.]   Plaintiff reported her pain occurred intermittently and fluctuated, and her pain was relieved by exercise, RX pain meds, and rest. [*Id*.]

26

An MRI of Plaintiff's lumbar spine taken on December 16, 2010, led to the following findings by Donald Olofsson, DO:

1.      Mild caudal spondylosis. Neural contact and slight deflection of the rigth S1 nerve root without frank impingement. Recommend correlation for symptoms in the distribution of the right S1 nerve.

2.      Mild to moderate hypertrophic changes. Mild levoconvex scoliosis.

[R. 713.] An MRI of the cervical spine taken the same day resulted in the following findings:

1.      Mild-to-moderate cervical spondylosis with mild reversal of the normal cervical lordosis.

2.      Slight progression of the degenerative change from the comparison study dated October 14, 2009. Neural contact at multiple levels. The degenerative change is most pronounced C4-5 through C6-7.

3.      Recommend correlation for symptoms in distribution of both C6 and the left C7 nerves from contact with the ventral nerve rootlets at the lateral recess bilaterally at C5-6 on the left at C6-7.

[R. 715.]

Plaintiff next saw Dr. Marzluff on January 5, 2011, for an evaluation of neck pain, right arm pain, back pain, and right leg pain. [R. 711.] Dr. Marzluff indicated that Plaintiff had continued right shoulder pain and has had multiple operations on her right shoulder, including one done in the last couple months. [*Id*.] Plaintiff complained that her pain sometimes radiates down her right arm and sometimes she feels pain in the back and into her right leg. [*Id*.] Physical examination revealed that Plaintiff had decreased range of motion of the neck in all directions and pain upon extremes of movement; no motor, sensory or reflex abnormality was noted. [*Id*.]

On January 27, 2011, Plaintiff saw Dr. Mullen on follow up with complaints that she hurt all over and was still having severe breakthrough pain even on Flexeril and Neurontin. [R. 722.] Dr. Mullen noted that Plaintiff's pain continues in diffuse pattern and migrating epicenters. [*Id*.] On neurologic exam, Plaintiff's motor strength was 5/5 bilaterally throughout; gait normal; sensation intact to light touch and pressure; back normal except for myofascial tenderness; and her extremities had not clubbing, edema or rash. [*Id*.]

In March 2011, Plaintiff presented to Dr. McKoy with complaints of left shoulder pain which was an aching pain that occurred occasionally. [R. 755.] Dr. McKoy noted that Plaintiff had fibromyalgia which has complicated her recovery; she also has not returned to physical therapy and wants to do it on her own. [R. 756.] On March 18, 2011, Plaintiff underwent an intralaminar lumbar epidural steroid injection at L5-S1 due to her back pain adversely affecting her activities of daily living. [R. 724.]

On April 19, 2011, Plaintiff returned to Dr. Mullen on follow up with complaints that the injection did not help at all and that she has not been able to perform her daily activities in less pain. [R. 725.] On neurologic exam, Plaintiff had 5/5 motor strength bilaterally throughout; normal gait; intact sensation to light touch and pressure; myofascial pain in the back with reduced ROM with lumbar flexion; and no clubbing, edema or rash in the extremities. [R. 725.] Dr. Mullen changed Plaintiff's medications and referred her to physical therapy. [*Id*.]

Plaintiff saw Dr. Mullen again on June 9, 2011, for a medication follow up. [R. 727.] Plaintiff indicated an increase in pain with the change in her medications and noted that physical therapy increased her low back/right leg pain and so she discontinued therapy. [*Id*.] Again, on neurologic exam, Plaintiff had 5/5 motor strength bilaterally throughout;

28

normal gait; intact sensation to light touch and pressure; myofascial pain in the back with reduced ROM with lumbar flexion; and no clubbing, edema or rash in the extremities. [*Id.*] Plaintiff was assessed with fibromyalgia, low back pain, shoulder pain, and neck pain. [*Id.*]

On September 19, 2011, Plaintiff returned to Dr. Mullen for followup to medication and complaints of continued pain and depression. [R. 847.] On neurologic exam, Plaintiff had 5/5 motor strength bilaterally throughout; normal gait; sensation intact to light touch and pressure; normal back; and no clubbing, edema or rash in the extremities. [R. 847.] Dr. Mullen noted that there might be some benefit in psych counseling and cognitive behavioral therapy in the future. [R. 848.]

On October 20, 2011, Plaintiff presented to Dr. Mullen for a follow up to her medication with complaints that her medications did not help her pain and that she is not able to perform her normal daily activities. [R. 849.] On neurologic exam, Plaintiff had 5/5 motor strength bilaterally throughout; normal gait; sensation intact to light touch and pressure; normal back; no clubbing, edema or rash in the extremities; normal hip ROM with some tightness at maximal rotation; and negative provocative maneuvers straight leg raises. [R. 847.] Dr. Mullen indicated he believed Plaintiff's pain was primarily fibromyalgia and that Plaintiff would benefit from more education and exercise; he did not agree with narcotic anlagesia and would not be prescribing such. [*Id.*]

On December 5, 2011, Plaintiff presented to Dr. Nancy Lembo ("Dr. Lembo") of Carolina Spine & Sports Rehab Specialists for electrodiagnostic consultation with her chief complaint being low back pain radiating to the right lower extremity, associated numbness and tingling in a similar distribution, and weakness and difficulty walking. [R. 877.] Dr. Lembo explained the EMG & NCV findings as follows:

1.   All nerve conduction studies were within normal limits.
2.   All left vs. right side differences were within normal limits.
3.   The Right Tibial H-Reflex has prolonged latency.
4.   Electromyographic evaluation of the Right MedGastroc and the Right BicepsFemL muscles showed increased insertional activity and moderately increased spontaneous activity.
5.   All remaining muscles showed no evidence of electrical instability.

[R. 877.]  Dr. Lembo noted her impression that the study was abnormal with Right S1 radiculopathy, subacute, moderate. [*Id*.]  Dr. Lembo recommended a lumbar epidural injection with fluoroscopic guidance coving the S1 nerve root.  [*Id*.]

In January 2012, Plaintiff underwent Right L3-L4 and L4-L5 and L5-S1 intraarticular facet joint injections under fluoroscoic guidance for her lumbar facet and low back pain. [R. 884.] In February 2012, Plaintiff returned to Dr. Lembo complaining of unchanged pain after the injection, primarily on the right side and radiating down the right leg.  [R. 885.] Examination of the spine did not reveal any evidence of thoracolumbar shift and there was normal lumbar lordosis; however, range of motion was painful in both forward flexion and extension, with more pain on extension.  [R. 885.]  Plaintiff was assessed with L5-S1 small HNP; L-facet arthropathy; and chronic pain. [R. 886.]   Plaintiff underwent a subsequent right L5 and right S1 transforaminal epidural injection under fluoroscopic guidance on February 17, 2012.  [R. 888.]

On February 29, 2012, Plaintiff was seen on follow up alleging her symptoms had not improved since the lumbar ESI.  [R. 889.]  Plaintiff indicated the pain, which she described as sharp and throbbing, was primarily across her lower back and radiated down both legs, the right more than the left.  [*Id*.] Plaintiff alleged associated numbness and tingling and stated that the symptoms were aggravated by bending and twisting and relieved by sitting. [*Id*.]  On spinal exam, Dr. Lembo noted that the spine did not reveal any

evidence of a thoracolumbar shift; there was flattening lumbar lordosis; no point tenderness in the midline; tenderness in the paraspinal muscles bilaterally; and Plaintiff's range of motion was painful in both forward flexion and extension, with more pain in flexion. [*Id*.]

On April 4, 2012, Plaintiff returned to Dr. Lembo complaining that her pain was not being controlled by medication; that her pain radiated across her lower back; the pain was sharp and throbbing; there was numbness and tingling associated with her pain; and she was having trouble with balance and frequent falls.  [R. 892.] Dr.  Lembo referred Plaintiff for a surgical consult, MRI brain with and without contrast, and resumed hydrocodone no more than twice a day.  [R. 894.]   On April 24, 2012, Plaintiff presented to Dr. R. Morgan Stuart ("Dr. Stuart") complaining of worsening low back pain.  [R. 902.] Plaintiff reported that her pain had an intermittent component with shoots down both legs, and that she feels her right leg "give out" sometimes. [*Id*.]  Dr. Stuart noted that Plaintiff was able to tandem, heel and toe walk without difficulty, and that her motor strength was 5/5 bilaterally throughout. [*Id*.] Dr. Stuart assessed Plaintiff with lumbar radiculopathy and lower back pain.  [R. 903.]  Because he could find no definitive etiology for Plaintiff's pain, Dr. Stuart determined that there were no surgical options and deferred further management to Dr. Lembo. [*Id*.]

Plaintiff returned to Dr. Lembo on May 2, 2012, complaining that her pain, which she described as "burning aching" was unchanged, radiating, associated with numbness and tingling.  [R. 896.] Spinal examination was normal except that range of motion was painful in both forward flexion and extension, more in flexion. [*Id*.]  Muscle strength was 5/5, DTR's

31

were 2/4, and sensory examination was also normal.  [*Id.*]  Dr. Lembo ordered physical activity counseling, a trial of fentanyl patch for improved pain control, and a continuation of her other medications. [*Id.*]

On June 2, 2012, Plaintiff was seen at Roper Hospital for right hip pain.  [R. 906.] A unilaterview view of the pelvis and frogleg projection obtained of the right hip showed no fraction or dislocation; the joint was preserved; and the sacroiliac joints were intact and unremarkable.  [*Id.*]  Plaintiff was seen on July 20, 2012, and on February 22, 2013, *after her date last insured*, for injections due to low back pan and sacroiliac joint pain. [R. 907–10.]  On February 22, 2013, Plaintiff also received a right L5 and right S1 epidurogram for her low back pain, lumbar disk herniation, and right lower extremity radiculopathy.  [R. 911.]

Plaintiff returned to Dr. Lembo on March 11, 2013, on follow up with complaints of pain which had not improved following lumbar ESI. [R. 931.] Plaintiff explained her pain was mainly across her lower back with intermittent radiation into her legs, and that her pain was aggravated by standing, walking, and laying flat and relieved by leaning forward, sitting and changing positions. [*Id.*] An examination of the spine showed no evidence of thoracolumbar shift, but showed flattening lumbar lordosis; no point tenderness in the midline but tenderness in the paraspinal muscles bilaterally; painful ROM in both forward flexion and extension, with more pain on extension; no evidence of atrophy fasciculations or erythmea; motor strength 5/5; and normal sensory examination. [*Id*.]  Plaintiff was assessed with lumbar facet arthropathy, L4-5, L5-S1 disc bulging, right LE radiculopathy, and myofascial pain.  [R. 932.]  On March 15, 2013, Plaintiff under went a right L3,L4,L5

32

medial branch block under fluoroscopy with no complications.  [R. 936.]  On March 22, 2013, Plaintiff underwent a right lumbar medial branch block under fluoroscopic guidance with no complications.  [R. 934.]

On April 29, 2013, Plaintiff presented to Dr. Lembo on follow up complaining that her pain improved for 2 hours following the first lumbar MBB but the second injection did not help at all. [R. 938.]  Plaintiff reported that her pain was primarily on the right side with radiation down her right leg, and associated numbness and tingling. [R. 938.] Plaintiff reported her pain was aggravated by walking, standing, and bending, but relieved by sitting. [*Id.*] Examination of the spine was generally normal with the exception of tenderness in the paraspinal muscles bilaterally, painful ROM in extension, motor strength 5/5, and normal sensory examination.  [*Id.*]  Dr. Lembo referred Plaintiff to Chiropractic rehab to address residual mechanical issues because Plaintiff failed to respond to lumbar MBB and lumbar ESI and joint injections. [*Id.*]

On June 8, 2013, Plaintiff presented to the emergency department ("ED") of Roper St. Francis HealthCare complaining of an acute exacerbation of chronic back pain.  [R. 912.]  On examination, Plaintiff's pain was found to be mild with normal ROM; normal motor strength, sensation, gait and no obvious gross deficits.  [*Id.*]   On September 20, 2013, Plaintiff underwent a right L3-L4, L4-L5 and L5-S1 intraarticular facet joint injection under fluoroscope guidance.  [R. 922.]  On November 15, 2013, Plaintiff underwent a right L3, L4, L5 medial branch block under fluoroscopic guidance.  [R. 923.]

On July 2, 2013, Plaintiff returned to Dr. Lembo on follow up with a marked increase in pain complaints after running out of Cymbalta. [R. 941.] Plaintiff described her pain as primarily on the right side with radiation down her right side and associated numbness and

33

tingling. [*Id*.] Plaintiff relayed that her pain was aggravated by walking, standing, bending, and relieved by sitting. [*Id*.] Plaintiff's spinal examination had normal findings with the exception of tenderness in the paraspinal muscles bilaterally, painful ROM on extension. [*Id*.] Dr. Lembo offered a trial of Effexor as Cymbalta samples were not available. [*Id*.] On August 28, 2013, October 28, 2013, and December 11, 2013, Plaintiff returned to Dr. Lembo with the same complaints from July 2 and unchanged exam findings. [R. 943, 947, 950.] On September 20, 2013, Plaintiff underwent a right L3-L4, L4-L5 and L5-S1 intraarticular facet joint injection for her lumbar facet arthropathy, lumbar spondylosis and lumbar facet pain. [R. 946.] Plaintiff underwent another right L3,L4,L5 medial branch block under fluoroscopic guidance on November 15, 2013, and January 6, 2014. [R. 949, 952.]

Plaintiff returned to the ED with complaints of acute exacerbation of back pain on January 30, 2014. [R. 914.] On examination, Plaintiff's pain was noted to be moderate with normal ROM and spinal alignment, no CVA or vertebral tenderness, and negative straight leg raises. [*Id*.] Additionally, Plaintiff was noted to have normal orientation, motor strength, sensation and gait. [*Id*.]

On February 5, 2014, Plaintiff returned to Dr. Lembo with improved pain. [R. 954.] By Plaintiff's follow up appointment with Dr. Lembo on February 19, 2014, Plaintiff's pain had worsened again. [R. 956.] Plaintiff's ROM was painful on extension and Gillet's was positive on the right. [*Id*.] Plaintiff saw Dr. Lembo again on March 12, 2014, and April 9, 2014, with unchanged pain and painful ROM on extension. [R. 958, 960.]

Nurse Practitioner Jack Staffer ("Staffer") provided a medical source statement dated April 14, 2014, opining with respect to Plaintiff's ability to do work related activities on a day to day basis in a regular work setting, and he limited Plaintiff as follows:

*     sit, stand, walk 1 hour in an 8-hour day due to pain and limited ROM;

*     occasionally lift up to 10 pounds and never more due to shoulder pain disruption s/p surgical intervention and injury;

*     never carry;

*     sit or stand 10 minutes before changing position to relieve pain;

*     no repetitive action with the right hand, including grasping, pushing, pulling and fine manipulation; simple grasping with the left hand, but no pushing, pulling or fine manipulation with the left hand due to shoulder pain;

*     miss work four or more times a month due to her impairments;

*     unable to bend, squat, crawl, climb, reach above, stoop, crouch, kneel.

[R. 962–967.]  Staffer also opined Plaintiff would have difficulty with low and moderate levels of stress; and the side effects of her medication included drowsiness and irritabilty. [R. 966.]

**RFC Determination and Weight Given to Medical Opinions**

Plaintiff first contends the ALJ's decision does not rest on substantial evidence because the ALJ failed to sufficiently explain his rationale in crediting or discrediting the evidence.  [Doc. 19 at 9–10.]  More specifically, Plaintiff argues the ALJ, again, failed to adequately address the restrictions regarding the repetitive use of Plaintiff's right arm. [*Id.* at 20.] Plaintiff also contends the ALJ failed to address Dr. Forrest's opinions, only addressed the weight restriction of Dr. McKoy's opinion, dismissed Nurse Staffer's opinion, and gave weight to the contradictory state agency opinions without discussion.  [*Id.*]

35

The Commissioner contends the ALJ's decision is supported by substantial evidence, and the ALJ thoroughly assessed and discussed the extent to which Plaintiff could use her right arm in a work setting. [Doc. 18 at 22–23.] The Commissioner also argues that the ALJ also discussed, and assigned some weight, to Dr. McKoy's latest medical source statement issued in June 2010, finding Plaintiff had permanent restrictions of 10 pounds of lifting with her right upper extremity; and if the ALJ erred in his silence, the error is harmless because he would have arrived at the same decision and RFC limitations. [*Id*. at 25.]

### *ALJ's RFC Determination*

With respect to Plaintiff's right shoulder impairment, the ALJ explained his evaluation of the evidence as follows:

> The claimant has been assessed as suffering from right rotator cuff tear status post-surgery and cervical spondylosis/degenerative disc disease. For the claimant right rotator cuff tear status post-surgery, she underwent two surgeries for this repair, but has not received any significant treatment for his impairment since her last surgery in September 2010. (Exhibit 14F). While she continued to occasional complain of shoulder pain, physical examinations of her shoulder were essentially normal. She did not receive any additional diagnostic testing, including no x-rays or MRIs of her shoulder since her last surgery. A physical examination in January 2011 found she had normal and equal muscle strength bilaterally in both upper extremities, and another examination in September 2011 found her extremities were normal. (Exhibits 15F, 17F). Since her 2010 surgery on her shoulder, the claimant has failed to seek medical treatment particularly related to her shoulder injury. She has not received any pain medication specifically related to her injury. She has not undergone any injections, and has not undergone any additional physical therapy. The claimant failed to report to any emergency room or urgent care center complaining of any debilitating pain in her shoulder. Further, she has not maintained regular medical treatment from any orthopedic

> surgeon or other shoulder specialist since her surgery in 2010. However, I have taken the claimant's right rotator cuff tear status post-surgery into account, and have therefore limited the claimant to work which involves no more than occasional overhead reaching with the right upper extremity, or more than frequent handling with the right upper extremity.

[R. 376.] Prior to making this determination, the ALJ discussed Plaintiff's medical history in general from June 2006 through about January 2012. [R. 374–76.] Evidence after Plaintiff's DLI was not addressed by the ALJ other than to say that the evidence was "only marginally material to the discussion of the claimant's disability." [R.376.]

With respect to the treating and state physicians's medical opinions on this issue, the ALJ explained as follows:

> In June 2010, Dr. Brodie McKoy assessed that after a physical examination, the claimant was suffering from a rotator cuff repair of her right supraspinatus tendon, and she had slightly dimimshed strength of her cuff. He found the claimant had permanent lifting restrictions of 10 pounds of lifting with her right upper extremity. (Exhibit 21F). This opinion has been evaluated, and has been given some weight, as Dr. McKoy is the claimant's treating orthopedic surgeon, and his opinion is consistent with his treatment notes. Therefore, his opinion has been incorporated into the residual functional capacity evaluation, as lifting this weight with both arms would be within the light exertional level.

> In April 2014, nurse practitioner Jack Staffer assessed the clamant could only sit, stand, and walk a total of one hour during an eight-hour day, due to pain and limited range of motion. He reported the claimant could only rarely lift up to 10 pounds, but was unable to carry any weight due to the pain in her shoulder, and that she would only be able to sit or stand a total of 10 minutes before she would need to change positions. Additionally, he assessed the claimant would be unable to perform any postural movements, and she would most likely be absent from work four or more times a month due to her impairments. (Exhibit 25F). This opinion has also been taken into account, but has been given little weight. Mr. Staffer, as a nurse practitioner, is not an acceptable medical source

37

pursuant to 20 CFR §404.1513(a) and §416.913(a). Further, Mr. Staffer's opinion is not supported by the medical evidence of record.

The residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services also found the claimant was not disabled albeit using a different rationale. Although these physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, these opinions do deserve some weight as they are supported by the objective medical evidence of record.

[R. 378.]

### *Discussion*

As noted in the Court's previous Order, on a number of occasions, Plaintiff's treating physicians indicated she could not perform work involving repetitive activities with her upper extremities.  On November 28, 2007, Dr. Forrest indicated he did not think Plaintiff would be able to return to assembly line work that involved repetitive activities with the upper extremities.  [R. 205.]  On January 16, 2008, Dr. Forrest noted Plaintiff would not be able to return to her previous type of assembly work where repetitive upper extremity activity is required.  [R. 202.]  On March 12, 2008, Dr. Forrest stated Plaintiff could not return to her prior jobs because she is right hand dominant and the use of her right upper extremity would be very limited.  [R. 197–98.]  On October 1, 2008, Dr. Forrest indicated Plaintiff, who is right handed, would be limited with regard to any repetitive use of the right upper extremity.  [R. 186.]

Additional evidence provided by Plaintiff includes evidence of an additional rotator cuff surgery on December 8, 2009 [R. 348, 735], and a medical source statement from Dr. McKoy indicating Plaintiff could never lift over 10 pounds, never carry, could use her hands

38

for repetitive action such as simple grasping and fine manipulation, but not for repetitive action such as pushing or pulling, would have to miss work more than four times a month, and her prescription medicines caused drowsiness and impaired concentration. [R. 364.] Dr. McKoy also opined that Plaintiff was unable to bend, squat, crawl, climb, reach above, stoop, crouch or kneel. [*Id.*] In a letter dated June 10, 2010, Dr. McKoy opined Plaintiff was permanently restricted to lifting no more than 10 pounds due to her rotator cuff repair. [R. 900.] Further, an MRI of Plaintiff's shoulder in July 2010 showed another partial tear and mild atrophy of the supraspinatus and infraspinanus along the central tendon. [R. 758.]

In January 5, 2011, Dr. Marzluff indicated Plaintiff had recently had another surgery on her right shoulder. [R . 711.] And in April 2014, Nurse Practitioner Staffer opined, among other limitations, that Plaintiff could perform no repetitive action with her right hand. [R. 963.]

In contrast, a physical RFC assessment completed by Dr. Liao, a medical consultant considering only medical evidence dated between July 2006 and October 2008, indicated Plaintiff could push and/or pull in an unlimited fashion except for the weight restrictions noted in the lift and carry section [R. 300] and further indicated Plaintiff was limited only with respect to overhead reaching and handling [R. 302]. However, in the same physical RFC assessment, Dr. Liao noted that Dr. Forrest's opinion that Plaintiff would be *very limited* with regard to any repetitive use of her RUE was consistent with objective findings. [R. 305.]

As explained above, the ALJ found Plaintiff retained the RFC to perform light work, which is defined as the ability to lift/carry 10 pounds frequently and 20 pounds occasionally, stand and/or walk 6 hours in an 8 hour workday, and sit 6 hours in an 8 hour workday, with

the additional restrictions that Plaintiff could not perform work that would require more than occasional climbing of ladders or overhead reaching. [R. 19.] The ALJ also gave "some weight" to Dr. McKoy's statement that Plaintiff has a permanent lift restriction to 10 pounds and stated he incorporated this restriction into the Plaintiff's RFC. [R. 378.] The ALJ, however, gave little weight to Staffer's opinion that Plaintiff could only rarely lift up to 10 pounds and was unable to carry any weight due to her shoulder pain because he was not an acceptable medical source. [R. 378.] The ALJ gave "some weight" to the opinions of the state physicians finding them supported by the objective medical evidence. [*Id.*]

Upon review, the Court cannot find the ALJ's RFC assessment is supported by substantial evidence as it fails to explain his consideration of the weight of evidence contradicting his finding. As an initial matter, the ALJ appears to accept Dr. McKoy's opinion that Plaintiff is restricted to lifting 10 pounds with her right upper extremity but still finds Plaintiff capable of lifting 20 pounds occasionally (definition of light work) with no mention of this lifting being with the left hand only and without the aid of the right upper extremity. It is unclear to the Court, upon reading the ALJ's decision, how the treating physician Dr. McKoy's opinion and the ALJ's RFC finding regarding Plaintiff's ability to lift, are consistent.

Additionally, the Court notes several inconsistencies between the evidence of record and the ALJ's findings which lack discussion or explanation. For instance, the ALJ discounted Plaintiff's complaint that she is unable to focus due to her pain medication [R. 377]; however, Dr. McKoy opined that Plaintiff's prescription medication caused drowsiness and impaired concentration [R. 362–65]. The ALJ provided no explanation as to why he rejected Dr. McKoy's statement regarding the side effects of Plaintiff's medication, or how

40

he weighed this opinion, in light of the fact that Dr. McKoy's statement corroborates Plaintiff's complaint. Furthermore, the ALJ adopted Dr. Liao's opinion that Plaintiff could frequently climb ramp/stairs, balance, stoop, kneel, crouch, and crawl but only occasionally climb ladder/rope/scaffolds [R. 301] based on evidence Dr. Liao reviewed between July 2006 and October 2008, but the ALJ did not sufficiently explain how he considered later evidence, including Dr. McKoy's April 29, 2010, opinion that Plaintiff was unable to bend, squat, crawl, climb, reach above, stoop, crouch or kneel [R. 364]. *See Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (explaining that a treating physician opinion on the nature and severity of an impairment is entitled to controlling weight if it is well supported by medically acceptable evidence and not inconsistent with other substantial evidence).

Also, the ALJ rejected the opinion of nurse practitioner Staffer because he was not an acceptable medical source without a proper evaluation and or determination of whether the impairments found related back before the DLI or were some new impairment. The Social Security regulations distinguish between opinions from "acceptable medical sources" and "other sources." *See* 20 C.F.R. § 404.1513(d). Social Security Ruling 06–03p further discusses "other sources" as including both "medical sources who are not acceptable medical sources" and "non-medical sources." The ALJs are instructed to apply the factors, or their basic principles, for evaluating the opinions of acceptable medical sources, which are listed in 20 C.F.R. § 404.1527(d), in evaluating the opinions from other sources with the understanding that not every factor may apply. *See* SSR 06-03p. The ALJ failed to perform any such evaluation.

Furthermore, the Court finds the ALJ's cursory dismissal of all medical evidence after the DLI as merely "marginally material" [R. 376] is not supported by substantial

41

evidence. The Fourth Circuit stated that "[m]edical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012). The Court held that "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." *Id*. at 341 (citation omitted). Here, the medical evidence relating to the time period after the DLI appears to be linked to Plaintiff's impairments prior to her DLI. For example, Staffer's April 14, 2014, source statement explained that Plaintiff's lifting restrictions were based on her shoulder injury and surgical intervention, which occurred prior to the DLI. And curiously, Staffer's opinion appears to be consistent with opinions given by Plaintiff's treating physicians prior to the DLI. Thus, at a minimum, the ALJ was required to evaluate Staffer's opinion in accordance with the instruction provided in SSR 06–03p.

**Failure to Consult Vocational Expert**

As stated above, the Court cannot determine from a reading of the ALJ's decision how the ALJ squared Plaintiff's limited use of her right upper extremity, as opined by Dr. Forrest and Dr. McKoy, with an RFC requiring an ability to occasionally reach overhead and perform frequent handling with her right upper extremity. The record clearly indicates that Plaintiff had two previous unsuccessful work attempts as an assembly worker, but was unable to perform the job, which required repetitive use of her arm, due to her impairment. [R. 118, 123.] Dr. Forrest explained that Plaintiff was unable to return to this type of work because she was "right hand dominant" and the "use of the right upper extremity [was] very limited." [R. 197–98.]

42

Notwithstanding this evidence, the ALJ determined that Plaintiff could occasionally reach overhead and frequently handle with her right upper extremity without any explanation of how evidence contradicting this conclusion was considered, weighed, and discounted. Reaching (extending the hands and arms in any direction) is an activity required in almost all jobs. SSR 83-15. Significant limitations of reaching, therefore, may eliminate a large number of occupations a person could otherwise do and varying degrees of limitations would have different effects; and the assistance of a vocational expert ("VE") may be needed to determine the effects of the limitations. *Id.* SSR 83–12 makes clear that significant loss of the use of an upper extremity is a critical factor that a VE must take into account in determining the size of the remaining occupational base and "discusses not just complete loss of the use of the arm (e.g. paralysis or amputation) but also "partial loss of use of the extremity." SSR 83–12, 1983 WL 31253, at *4. Thus, the ALJ's proper consideration and explanation of his findings with respect to Plaintiff's ability to use her right upper extremity in the work setting was critical, and, in this case, required the involvement of a VE at the June 16, 2014, hearing to determine the effect of the limited use of Plaintiff's right arm on the occupational base associated with her RFC.

Additionally, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," and one of the symptoms he referred to was pain. The ALJ also found Plaintiff's "subjective complaints . . . to be overstated." The Court finds that the ALJ thus determined that Plaintiff suffered from some pain but that she overstated her pain. Further, as noted above, Plaintiff testified that her pain medications caused her inability to focus, lack of concentration, and drowsiness. And, Dr. McKoy opined that Plaintiff's prescription medication caused

43

drowsiness and impaired concentration. Substantial evidence does not support that ALJ's decision to not utilize the assistance of a VE in the face of these nonexertional limitations of pain and inability to concentrate. *See Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983) (the Secretary must produce a VE to testify about jobs available in the national economy when claimant suffers from exertional and nonexertional limitations and may not rely exclusively on the Grids; the ALJ erred because substantial evidence showed Grant had nonexertional impairments and the ALJ made no specific findings as to whether or not they existed); *cf. Hays v. Sullivan*, 907 F.2d 1453, 1458 (4th Cir. 1990) (where a claimant suffers only from exertional impairments, the application of the Grids does not require the use and consideration of a VE).

After careful review and consideration of the arguments and the record, the Court is constrained to agree with Plaintiff. It finds that the Commissioner's decision should be reversed and remanded so that the ALJ can adequately explain his consideration of the medical evidence and utilize a VE. Accordingly, the Court finds that substantial evidence fails to support the ALJ's decision.

**Plaintiff's Remaining Arguments**

Upon remand, the Commissioner should reconsider Plaintiff's arguments not addressed by this decision as part of the overall reconsideration of this claim. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 763–64 (W.D.Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted de novo).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, IT IS RECOMMENDED that the Commissioner's decision be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g).

IT IS SO RECOMMENDED.


s/Jacquelyn D. Austin
United States Magistrate Judge


January 20, 2016
Greenville, South Carolina

45